1  KEVIN K. BATTEH, (DC Bar No. 482021)
   Trial Attorney
2  JAMES H. HOLL, III, (DC Bar No. 453473)
   Senior Trial Attorney
3  ERIN E. VESPE, (CT Bar No. 407295)
   Chief Trial Attorney
4  U.S. Commodity Futures Trading Commission
   1155 21st St. N.W.
5  Washington, D.C. 20581
   Telephone (202) 418 -5636
6  Facsimile (202) 418-5538
7  E-mail: kbatteh@cftc.gov

8
   Attorneys for Plaintiff U.S. Commodity
9  Futures Trading Commission

10 WAYNE STRUMPFER
   Acting California Corporations Commissioner
11 ALAN S. WEINGER (CA State Bar No. 86717)
   Acting Deputy Commissioner
12 EDWARD KELLY SHINNICK (CA State Bar No. 96209)
   Corporations Counsel
13 71 Stevenson Street, Ste. 2100
   San Francisco, CA 94105-2908
14 Telephone (415) 972-8544
   Facsimile (415) 972-8550
15 E-mail: KShinnic@corp.ca.gov
16
17 Attorneys for Plaintiff Commissioner of
   Corporations of the State of California
18

19
                    **UNITED STATES DISTRICT COURT**
20              **NORTHERN DISTRICT OF CALIFORNIA**
                      SAN FRANCISCO DIVISION
21

22 U.S. COMMODITY FUTURES TRADING          )  Case No.: 05-cv-2641 JSW
   COMMISSION and THE COMMISSIONER         )
23 OF CORPORATIONS OF THE STATE OF         )
   CALIFORNIA,                             )  Assigned to Hon. Jeffery S. White
24                                         )
                                           )
25        Plaintiffs,                      )  Hearing August 26, 2005 9:00 a.m.
                                           )
26    vs.                                  )  PLAINTIFFS' REPLY MEMORANDUM OF
                                           )  POINTS AND AUTHORITIES IN SUPPORT
27 NATIONAL INVESTMENT                     )  OF THEIR MOTION FOR PRELIMINARY
   CONSULTANTS, INC., a California         )  INJUNCTION AND OTHER ANCILLARY
28 corporation, SOUTH CHINA               )  RELIEF

1     INVESTMENTS, INC., a California     )
    corporation,     )

2     PACIFIC BEST GROUP LTD, a.k.a.     )

3     PACIFIC BEST COMPANY LTD, a British     )
    Virgin Islands Corporation, YI KERRY XU,     )

4     an individual, RUN PING ZHOU a.k.a     )
    FLORA ZHOU, an individual, and WEI M.     )

5     TSE a.k.a. RAYMOND TSE, an individual,     )
        Defendants,     )

6     )

7        and     )
    )

8     THERESA C. WONG, an individual,     )
        Relief Defendant.     )

9     )

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................... 1

II.   STATEMENT OF ISSUES ......................................................................... 2

III.  STATEMENT OF FACTS............................................................................ 2

IV.   ARGUMENT ................................................................................................. 2

    A.   Strong Evidence of Fraud Abounds ............................................... 3

        1.   Raymond Tse Declarations ........................................... 4

        2.   Flora Zhou's Declarations ............................................. 4

        3.   Jian Xiao's Declaration .................................................. 5

    B.   Defendants Fail to Rebut Plaintiff's Prima Facie Case............................ 6

        1.   Deposition Testimony of Ting ....................................... 6

        2.   Gordon Rausser's Declaration ...................................... 6

    C.   Defendant's Foreign Currency Transactions are Futures Contracts ......................... 7

        1.   Criteria That Establish a Futures Contract...................................... 8

        2.   Pacific Best Contracts are Futures Contract.....................................10

        3.   Even Under Zelener, Defendantts' Transactions Are Illegal Futures Contracts...............................................................11

    D.   Defendants Have Not Suffered Prejudice....................................13

V.    CONCLUSION............................................................................................. 14

**TABLE OF AUTHORITES**

**FEDERAL CASES**

*CFTC v. Zelner, et al.,* 2003 U.S. Dist. LEXIS 176600, affirmed by *CFTC vs. Zelner et al.,* 387 F3d 624 (7th Cir. 2004).................................................................................. 2

*CFTC v. Investeors Freedom Club, Inc.,* 8:03 CV-54-T-17TGW (M.D.Fla. April 8, 2004) ......... 8

*CFTC v. International Financial Services, Inc.* 323 F. Supp.2d 482 (S.D.N.Y. 2004) ............... 8

*CFTC v. Noble Wealth Data Info. Servs., Inc.,* 90 F. Supp. 2d. 676 (D. Md. Mar. 20, 2000). ........................................................................... 8

*Nagel v. ADM Investor Services, Inc.,* 217 F.3d 436 (7th *Cir. 2000)* ............................................... 8

*Lachmund v. ADM Investor Services, Inc.* 191 F.3d 777 (7th Cir. 1999)..................................... 8

*CFTC v. Co Petro Marketing Group, Inc.,* 680 F.2d 573 (182). ..................................................... 8

*CFTC v. Co Petro,* 680 F. 2d 573, 580 (9th Cir. 182) ..................................................................... 9

*CFTC v. Noble Wealth Data Info, Servs., Inc.,* 90 F. Supp.2d. 676, 688 (D. Md. March 20, 200), ........................................................................... 9

*Baragosh v. CFTC,* 278 F.3d 319 (4th Cir. 200) ......................................................................... 9

*CFTC v. Noble Metals Int'l, Inc.,* 67 F.3d 766 (9th Cir. 1995)..................................................... 10

*CFTC v. Standard Forex, Inc,* No. 93-0088, 1996 WL 435440, *1, 1996 U.S. dist. LEXIS 14778 At *2 (E.D.N.Y July 25, 1996) ......................................................... 10

*CFTC v.Frankwell Bullion* ......................................................................................................... 13

*CFTC v. Standard Forex,* 1996 WL 43544, *10 ......................................................................... 13

*CFTC v. Co PetroMkting. Group, Inc.,* 680 F2d 573, 581 (9th Cir. 1982) ............................. 13

*Chicago Mercantile Exchange v. SEC,* 883 F.2d 537, 549 (7th Cir. 1989)................................. 13

**FEDERAL STATUTES**

7 U.S.C. § 6a (2004) ................................................................................................................. 3

7 U.S.C. § §7 6b(a)(i) and (iii) (2004) ..................................................................................... 3

**STATE STATUTES**

Cal.Corp.Code § 29520 (2004)................................................................................................. 2

ii

## I.   INTRODUCTION

Plaintiff, the United States Commodity Futures Trading Commission ("CFTC" or the "Commission"), and plaintiff Commissioner of Corporations of the State of California ("State of California") (collectively, "plaintiffs") submit this Reply Memorandum of Points and Authorities in support of their Motion for Preliminary Injunction, and Other Equitable Relief against defendants National Investment Consultants, Inc. ("NICI"),  South China Investments, Inc. ("South China"), Pacific Best Group Ltd ("Pacific Best"), and individual defendants Yi Kerry Xu, Run Ping Zhou, and Wei M. Tse (collectively, the "defendants").

Since at least March 2004, defendants South China acting as a common enterprise with NICI (together the "South China Common Enterprise") and Pacific Best have been operating a foreign currency scam in San Francisco, California.  The South China Common Enterprise and Pacific Best have fraudulently solicited and accepted at least $356,500 from at least 9 known retail investors to engage in speculative trading of illegal off-exchange foreign currency futures contracts. These investors lost almost all if not all of their investment. [1]   Remarkably, defendants cannot even name the foreign exchange merchant through which they ostensibly trade customers' money.

In their opposition, defendants' do little to shed light on their illegal business activities. Remarkably, defendants cannot even name the foreign exchange merchant through which they ostensibly trade customers' money.  Instead, defendants choose to rest their case on: 1) declarations riddled with inconsistencies and falsehoods, 2) an argument that the contracts at issue constitute spot transactions, not futures contracts, weakly supported by a) the declaration of Gordon C. Rausser which is replete with information from his curriculum vitae but provides a

---

[1] The identities of  additional customer/victims have become known since the filing of this action. Four of those customers have submitted declarations showing that they too were subjected to the fraudulent solicitation practices of the defendants. See Ex.1-4.

Reply Memorandum of Points and Authorities

scant three paragraphs of cursory analysis, and by b) reliance almost entirely on one case that is not controlling precedent and which is distinguishable from the case before the Court, *CFTC v. Zelener, et al.*, 2003 U.S. Dist. LEXIS 17660, affirmed by *CFTC v. Zelener et al.*, 387 F.3d 624 (7th Cir. 2004), and 3) the declaration of defense counsel in support of defendants' complaint that they lacked sufficient time to respond to plaintiffs' allegations, despite over six weeks passing since defendants were served.

Plaintiffs' evidence stands unrefuted. The customers' declarations show that defendants engaged in repeated acts of fraudulent solicitation. Defendants' account opening documents and account statements as well as the declaration of a CFTC economist demonstrate that the contracts at issue are futures contracts, because they posses the key characteristics of futures contracts required by controlling precedent of this circuit, the ability to offset to avoid delivery and pricing established at the outset. Accordingly, the plaintiffs have shown a probable success on the merits of their action and are entitled to a presumption of irreparable injury, if a preliminary injunction is not issued.

## II.    STATEMENT OF ISSUE

Whether this Court should issue a preliminary injunction order against the defendants based on the evidence set forth herein demonstrating that the Commission has a probable success on the merits, *i.e.*, showing that the defendants violated Sections 4b and 4(a) of the Act and Commission Regulation 1.1(b), and is entitled to a presumption of irreparable injury?

## III.    STATEMENT OF FACTS

Plaintiffs rely on the Statement of Facts in their previously submitted Memorandum of Points and Authorities in support of their *ex part*e Motion for Statutory Restraining Order, Preliminary Injunction, and Other Equitable Relief.

## IV.    ARGUMENT

2

The evidence demonstrates that the defendants have committed fraud in violation of Sections 4b(a)(2)(i) and (iii) of the Commodity Exchange Act (the "Act"), 7 U.S.C. §§ 6b(a)(i) and (iii)(2004), and Commission Regulations 1.1 (b) (1) and (3), 17 C.F.R. §§ 1.1(b)(1) and (3) (2002). The evidence also shows that defendants Pacific Best and the South China Common Enterprise have offered and are offering illegal futures contracts in violation of Section 4(a), 7 U.S.C. § 6a (2004) and in violation of California law.[2]

**A.  Strong Evidence of Fraud Abounds**

The defendants' declarations contain numerous inconsistencies, falsehoods, and further evidence of fraud, glaring examples of which follow.

1) <u>Raymond Tse Declarations:</u>

Under the penalty of perjury, Mr. Tse declared,

- *"I do not have access to client funds nor do I give advice or ever represent to any of the customers the success or value of transactions."* Tse Decl., July 7, 2005, pg 2, ln 16-18.

- *"I do not hold any funds belong[sic] to any of the customers of NIC or PBC including the five named complainants." Id.* ln 26-28.

- *"I do not work for National Investment Consultants." Id.* ln 20- 21.

-  *"I am not and have never been an officer, director or managing agent of Pacific Best, National Investment Consultant or South China Investments and I never had any ownership interest in any of those entities. My job title at Pacific Best was business manager and I provided consulting work to NICI and held some meetings with NICI employees"* Tse Decl., August 11, 2005, ¶ 3.

All of these statements, like Mr. Tse's statements to his customer/victims, are false.

Bank records recently obtained show that Mr. Tse:

- did indeed have access and control of client funds, (Ex. 5, Declaration of State of

---

[2]  Even assuming, arguendo, that all of the defendants' factual and legal assertions are true, the defendants have conceded that their foreign currency contracts are offered in violations of California Corporations Code ("CCC") Section 29520. Defendants do not dispute the fact that they are offering commodity contracts. They simply argue that their foreign currency contracts are not futures contracts.

3

California Senior Examiner, Peter Mock, ¶ 4 hereinafter "Mock Decl. ¶4")

- in fact took NICI client funds into his own personal account, (*Id.*),

- was employed as a manager of *both* SCI and NICI (*Id.*)

- and in his capacity as a manager of both firms which comprise the South China Common Enterprise, wired client funds out of SCI and NICI accounts to an overseas account for the benefit of Pacific Best (*Id.*)

2) <u>Flora Zhou's Declarations:</u>

Under the penalty of perjury, Ms.Zhou declared,

- "*Defendant Raymond Tse did not have any ownership interest in SCI and was not an employee, officer or director of SCI at any time.*" Zhou Decl., August 11, 2005. ¶10.

As evidenced by bank records, this statement is an outright lie. Mock Decl. ¶4). But one need not look beyond the four corners of Zhou's two declarations to find other glaring inconsistencies and misrepresentations.  In Ms. Zhou's first declaration, she states:

- "*I have never given any advice regarding foreign investments, nor have I have I [sic] ever represented that there was money to be made in investing in foreign currency.*" Zhou Decl., July 7, 2005,  pg 2, ln. 9-12.

- "*I have never made or misrepresented to NIC customers or the trainees regarding the success of investing in foreign currency[sic].*" *Id.* pg. 4, ln. 2-5.

To the contrary, and by her own account, she did give specific advice about trading in foreign currency and did represent that there was money to be made in foreign currency.  In her second declaration, Zhou states,

- *I taught trainees to emphasize the speculative nature of foreign exchange training **as well as the profit potential**.*" Zhou Decl., August 11, 2005, ¶15.

- "*My training classes were instructed **to advise potential customers of the profit potential available by trading foreign currencies**.*" *Id.* ¶18.

- "*When Ms. Liang decided to open an account, she asked me to trade it for her.  I declined as I was going on vacation.  **I did tell her that if she traded her own account, to use stop loss orders** to protect her positions against excessive losses. Id.* ¶ 20.

4

- *"Ms. Liang brought Renee Ramos to my office.  Ms. Liang explained that she and Ms. Ramos were selling health care products but I was not interested.  Renee asked about the Swiss Franc market and I showed them the Dollar/Swiss Franc daily chart.  **I gave her my opinion on the prospects for a decline in the market and suggested that if she invests, to put in a stop order at a specific price of 1.2050.**"* Id. ¶ 21.

Also of note is Zhou's bewildering explanation of her prior encounter with financial regulators.  Commenting on an almost identical lawsuit filed by the State of California in 2000, Zhou recalls that she was "served with some documents from the California Department of Corporations regarding TII" and was "listed as one of the TII account executives named in the documents" *Id.* ¶ 6.  Zhou claims, "I had no idea then, nor do I fully understand now, what the Order of Permanent Injunction means." *Id.* ¶ 7.  This statement is incredible, and even if true, Zhou had notice of the action and must be presumed, as a purported commodity professional and instructor, to understand that she had been enjoined from committing fraud.

The similarities between the instant case before the Court and Zhou's prior California litigation are striking.  Both involved Ms. Zhou, a BVI corporation with an office in Hong Kong, a trading desk in Macau, and customer declarations alleging some of the exact same fraudulent solicitations that are alleged here. Plaintiffs request that the Court take judicial notice of the prior California litigation. For the Court's reference attached hereto as Exhibit 6 is a file stamped copy of the complaint in that case.  Some of the names have changed, but the scam is the same.

3) <u>Jian Xiao's Declaration</u>

Under the penalty of perjury, NICI owner, Mr. Xiao declared,

- *"NICI and Pacific Best do not have any corporate relationship, they are not parent or subsidiary and they do not have any officers or employees in common."* Xiao Decl., ¶ 5.

- *"Mr. Tse is not and has never been an employee of NICI but he did perform consulting and held some meeting for NICI explaining the policies of Pacific Best."* Id. ¶7

Both of these statements are false.  NICI and Pacific Best have an employee in common and that employee is defendant Tse.  Presumably, Mr. Xiao knows his employees, especially

those that have signatory authority on NICI bank accounts.  As detailed in section IV.A.1) above,

Mr. Tse had signatory authority over NICI bank accounts and used that authority to transfer funds

from NICI to Pacific Best.  NICI owner Xiao's patently false declaration should be disregarded.[3]

## B. Defendants Fail to Rebut Plaintiffs' Prima Facie Case

1) <u>Deposition Testimony of Ting</u>

Defendants cite incomplete sections of Mr. Ting's deposition in an attempt to divert this

Court's focus away from their illegal conduct.  The relevant portions of the transcript which were

omitted by defendants, are included.  (See Exhibit 8, Declaration of Kevin Batteh, Ex. A. Ting

Deposition Transcript).  Contrary to defendants assertions, Mr. Ting explained that 1) when Xu

threatened that her boss "had the power" in San Francisco, she was referring to organized crime

connections (*Id*. pp.91-92), 2) while, as part of his job as a real estate appraiser, he does prepare

appraisals which contain fine print (like the risk disclosure in the Pacific Best customer

agreement) and while he hoped his customers read the fine print in his appraisals, he does not

believe they read all of it.(Ting Dep. p. 105),  and 3) when Ting indicated that his net worth was

zero, he was referring to the net worth of his investment with the South China Common

Enterprise. (*Id*. pg. 99-100).

2) <u>Gordon Rausser's Declaration</u>

Defendants present Rausser's declaration, which effectively consists of three paragraphs,

to rebut plaintiffs' evidence that the contracts at issue are futures, not spot.  However, Rausser

concedes that the trades at issue "do exhibit some characteristics of futures contracts," and does

not otherwise offer insight to or analysis of defendants' contracts. Rausser Decl., ¶ 3.  Nor does

---

[3]  In its marketing materials, Mr. Xiao's company NICI falsely claims to be affiliated with an
NASD member firm and claims that NICI  "strictly follows" the regulations and rules of the New
York Stock Exchange.  (See Ex. 7, Jones Decl. ¶ 6).  This is yet another example of fraud
perpetrated by Mr. Xiao's company.

he opine that the contracts at issue are spot contracts rather than futures.  Rausser's primary but faulty premise is that based on the information reviewed by plaintiffs' expert Mr. Hobson, it would be impossible to determine that *all* of the transactions entered into by each and every customer are futures rather than spot contracts. *Id*. ¶ 4.  While plaintiffs must show that Pacific Best and the South China Common Enterprise offered futures contracts, plaintiffs' case does not require a showing that *all* of the illegal contracts offered by defendants are futures contracts. Moreover, defendants submitted no evidence showing that the trading of the customers analyzed by Mr. Hobson was not typical of the trading conducted by defendants on behalf of all customers, as evidenced by the standard customer agreement.[4]

Likewise, defendants' attack CFTC economist Hobson's declaration but offer no contrary evidence about the nature of their contracts. In fact, defendants are unable to tell this Court with certainty where they conduct some of their overseas transactions, but it is clear that Pacific Best is not registered with the CFTC and is not a proper counterparty to their customers foreign currency futures contracts.[5]   Instead of explaining the mechanics of their contracts, defendants simply conclude that since Mr. Hobson was the CFTC's expert in the *Zelener* case, the contracts here must be spot, not futures.

## C.    Defendants' Foreign Currency Transactions are Futures Contracts

---

[4] Rausser also erroneously implies that the contracts cannot be futures contracts because they are not "trades between strangers facilitated by novation." Rausser Decl. ¶ 4. This statement is inaccurate for two reasons.  First, the contracts at issue are arm length transactions between customers and Pacific Best.  Second, to the extent that novation plays a role *at times* in exchange traded futures contracts, novation is part of the clearing process of trades, not part of the execution of trades between parties.  In addition, Section 2(c)(2)(B) of the Act provides off-exchange foreign currency futures transactions between retail customers and certain permissible counterparties, with no requirement for novation or clearing.  Lastly, defendants provide no support in the case law that "novation" or a clearing function is a prerequisite to the existence of a futures contract.

[5]   While the evidence shows that Pacific Best was held out as the counter party to transactions with South China Common Enterprise customers, there is no evidence before the Court to show that Pacific Best is a proper counterparty. See e.g. Ex. 9, Declaration of Ken Koh.

7

Defendants claim that the contracts between Pacific Best and the South China Common Enterprise customers are spot contracts and cite *CFTC v. Zelener*, as if the Ninth Circuit had not already opined on the elements of a futures contract.[6] Defendants' reliance on *Zelener* is misplaced. Plaintiffs' opening memorandum establishes that defendants' contracts are futures under the relevant Ninth Circuit law that applies in this case. Nonetheless, even reading Ninth Circuit law with *Zelener* in mind, Plaintiffs have established a prima facie case of illegal futures contracts.[7]

### 1) Criteria That Establish a Futures Contract

#### (a)      *Futures Possess a Fungible Character*

As the Ninth Circuit explained in *CFTC v. Co Petro*, 680 F. 2d 573, 579-580, a basic feature of futures contracts is their fungible nature:

> Futures contracts traded on the designated markets have certain basic characteristics. Except for price, all the futures contracts for a specified commodity are identical in quantity and other terms. The fungible nature of these contracts facilitates offsetting transactions by which purchasers or sellers can liquidate their positions by forming opposite contracts. The price differential between the opposite contracts then determines the investor's profit or loss…

The *Zelener* court also focused, in large part, on the fungible nature of futures. "'The totality of circumstances' boil down to whether trading has occurred in fungible contracts." *Zelener*, 373 F.

---

[6] In fact, the leading Ninth Circuit Case on this issue, CFTC v. *Co Petro Marketing Group, Inc.*, 680 F.2d 573 (1982) is only fleetingly referenced in defendants' papers.

[7] Defendants' reliance on *Zelener* is misplaced. First, the Pacific Best transactions are significantly distinguishable from the transactions in that case as detailed in section IV.C.2. Second, *Zelener* is not controlling precedent in this Circuit. Third, its ruling is contrary to Second, Fourth, Ninth and Eleventh Circuit case law. See *CFTC v. International Financial Services, Inc.*, 323 F. Supp.2d 482 (S.D.N.Y. 2004); *CFTC v. Noble Wealth Data Info. Servs., Inc.*, 90 F. Supp.2d 676 (D.Md. 2000), aff'd in part and vacated in part sub nom. *Baragosh*, 278 F.3d 319, cert. denied, 537 U.S. 950; *Co Petro Marketing Group, Inc.*, 680 F.2d 573; *CFTC v. Investors Freedom Club, Inc.*, 8:03 CV-54-T-17TGW (M.D.Fla. April 8, 2004). Fourth, it ignored contrary precedent in its own circuit. See *Nagel v. ADM Investor Services, Inc.*, 217 F.3d 436 (7th Cir. 2000); *Lachmund v. ADM Investor Services, Inc.*, 191 F.3d 777 (7th Cir. 1999) Finally, it violated 7th Circuit rules by not explaining or overruling the conflict between the rulings. See 7th Circuit Rule 40(e).

8

3d 861, 867-868, citing *Nagel*, 217 F. 3d at 441.

Fungibility is achieved principally by the incorporation of contractual terms that are standardized and which therefore facilitate a market for the contract, or trading "in the contract," as opposed to a market for the commodity, or "trading in the commodity." *Zelener*, 373 F.3d at 865-66; *CME v. SEC*, 883 F. 2d at 542 ("A futures contract, roughly speaking, is a fungible promise to buy or sell a particular commodity at a fixed date in the future.  Futures contracts are fungible because they have standard terms and each side's obligations are guaranteed by a clearing house").  The ability to form offsetting contracts is essential since investors rarely take delivery against the contracts. *Noble Metals Int'l*, 67 F.3d at 772; *CFTC v. Co Petro*, 680 F. 2d 573, 580 (9th Cir. 1982). See also *Zelener*, 373 F.3d at 865-66 (stating that fungibility makes it possible for parties to "close a position by buying an offsetting contract.")

Likewise, the inclusion ex ante of contractual terms providing for the cancellation or cash settlement of the contract also provides a mechanism for discharging the parties' obligations under the contract.  Zelener, 373 F.3d at 868 (stating "a promise to create offsets makes a given setup work as if fungible:  although the customer can't go into the market to buy an equal and opposite position, the dealer's promise to match the idiosyncratic terms in order to close the position without delivery means the customer can disregard the absence of a formal exchange"); Co Petro, 680 F.2d at 580.  Such terms can be in lieu of, or in addition to, standardized delivery terms.  Zelener, 373 F.3d at 868; Co Petro, 680 F.2d at 580.  See also CFTC v. Noble Wealth Data Info. Servs., Inc., 90 F. Supp.2d. 676, 688 (D. Md. March 20, 2000), aff'd in part and vacated in part sub nom. Baragosh v. CFTC, 278 F.3d 319 (4th Cir. 2000), cert. denied, 123 S. Ct. 415 (2002) (a futures contract "may be fulfilled through offset, cancellation, cash settlement or other means to avoid delivery").[8]

---

[8]  By comparison, as the court in *Nagel* observed, parties trading forward contracts expect or are

9

1    Significantly, the right to offset can be either explicit in the contract, or it can be an implicit

2    representation.  For example, a promise by "the seller of the contract [] to sell another contract

3    against which the buyer can offset the first contract . . . could create a futures contract." *Nagel*,

4    217 F.3d at 441 (citing In re Bybee, 945 F.2d 309, 313 (9th Cir. 1991) and *Co Petro* at 580);

5
6    *Bybee*, 945 F.2d at 313 (seller of contracts "*implicitly* represented that it would provide for

7    offsetting contracts, even though the contracts it sold were not entirely standardized.") (emphasis

8    added).

9         (b)    *Price or Price Formula is Established at the Contract's Initiation*

10        Aside from a fungible nature, there is another criterion necessary to establish a futures

11   contract.  Specifically, a price or price formula must be established at the time the contract is

12   initiated.  *CFTC v. Noble Metals Int'l.*, 67 F.3d 766, 772 (9th Cir. 1995) ("A futures contract

13
14   enables an investor to hedge risk that the price of the commodity will change between the date

15   the contract is entered and the date delivery is due…the investor's profit or loss depends upon the

16   difference between the amount the investor contracted to pay for the commodity and what he gets

17   for it when he sells it");  *Co Petro*, 680 F.2d at 576; *In re Stovall*, [1977-1980 Transfer Binder]

18   Comm. Fut. L. Rep. (CCH) ¶ 20,941 at 23,777 (CFTC 1979); see also *CFTC v. Standard Forex,*

19   *Inc.*, No. 93- 0088, 1996 WL 435440, at *1, 1996 U.S. Dist. LEXIS 14778, at *2 (E.D.N.Y July

20   25, 1996).  Absent the establishment of a price or price formula at the formation of the contract,

21
22   there is no means upon which to value the contract and, therefore, no market for the contract can

23   arise.

24   2) Pacific Best Contracts are Futures Contract

25        Applying the *Ninth Circuit* law, as detailed in plaintiffs' opening memorandum, the

26   Pacific Best contracts possess these two key characteristics.  First, the Pacific Best contract

27

28
     reasonably assured" of delivery. *Nagel*, 217 F.3d at 441.

     Reply Memorandum of Points and Authorities

provides for the ability to offset and thus avoid delivery. Hobson Decl., ¶ 28.  The contract also provides an implicit right of off-set through the use of stop loss orders. "You may 'place 'stop loss' orders with PBCL to liquidate your position when the market reaches the price you have specified. . ." Pacific Best Customer Agreement, pg. 3, Ex. A to the previously filed Ting Decl. See also Pacific Best "Trading Rules and Regulations" Section V.(b) stating ("'Or Better' and 'Stop' (only for liquidation whether stop-profit or stop-loss) limit order will be accepted.") *Id.*

Consistent with the contract terms, defendant Zhou emphasized the use of stop loss orders in advising customers.  Zhou Decl., August 11, 2005, ¶15 ("I also emphasized that we had risk management tools such as stop loss and limit orders as well as entering into a temporary hedge transaction.").  The ability to place a stop-loss order is by definition the right to place an equal offsetting trade allowing the customer to get out of a position and avoid delivery. Moreover, defendants provide no evidence to suggest that there was ever actual physical delivery of currency to customers or that defendants hold currency that they purchased on behalf of customers.

Second, the Pacific Best contracts also incorporate a price or price formula that is established at the outset of each transaction.[9]  Irrespective of when an offsetting transaction is effected, it is this entry price and the price of the offsetting transaction that determines a customer's profit or loss.  Accordingly, the Pacific Best contracts possess the two essential characteristics of futures contracts.

3) Even Under *Zelener*, Defendants' Transactions Are Illegal Futures Contracts

Defendants' opposition is silent as to how the *Zelener* court's analysis of the spot v. futures issue applies to the contracts in this case.  However, even under *Zelener*, the defendants'

---

[9]  A review of any of the customer account statements shows that the price of a given position is set and carried forward on successive statements (i.e. the price is established at the time the customer enters the position.)

Reply Memorandum of Points and Authorities

contracts are futures. The Court in *Zelener* emphasized the two-day roll over feature described in the customer agreement as weighing heavily in the finding for a spot transaction. *Zelener*, 373 F.3d at 864. Here, there is no evidence of such a two-day rollover requirement or feature in the Pacific Best customer agreements, in their trading statements, or in any of the internal company records provided by the defendants to date.

The standardization of terms in the Pacific Best transactions is another important distinction between the forex transactions in this case and those between customers and AlaronFX in the *Zelener* case. *Zelener* 373 F.3d at 867 ("Customers of foreign exchange at AlaronFX did not purchase identical contracts: each was unique in amount of currency"). The Pacific Best foreign currency contracts are fungible, in part, because they are traded in standardized quantities for an underlying commodity that is, *ipso facto*, of a standardized quality. Pacific Best offered contracts in five currency pairs and all of the Pacific Best contracts for each currency pair offered are of a standard contract size. "Trading Rules and Regulations" Section I, Ex. A to previously filed Ting Decl. The rules for margin and other terms and conditions of the Pacific Best contract are also standardized, thereby facilitating offsetting transactions. *Id*.

Equally important, unlike in *Zelener* and as detailed above, the Pacific Best contract terms incorporate the ability to offset and thus provide a means to avoid delivery of the foreign currency. In *Zelener*, the language found in the AlaronFX documents asserted that in the absence of instructions from its customers AlaronFX had the "sole discretion . . . to deliver, roll over, or offset all or any portion of the Open Position." *Zelener*, 373 F.3d at 868. Here, by contrast, customers of the South China Common Enterprise must take additional affirmative steps to obtain delivery of foreign currency, both by "providing PBGL with all necessary delivery documents," and also by establishing the necessary *nostro* account (the latter requirement being

Reply Memorandum of Points and Authorities

glaringly absent from the Pacific Best documents).[10] Pacific Best Customer Agreement, pg 1,

¶4(a), Ex. A to Ting Decl.  Indeed, according to the Pacific Best contract, avoidance of delivery

is to be the default position in the absence of any contrary instructions. *Id*.

Unlike the South China Common Enterprise customers, AlaronFX customers had "no

assurance that they could close their positions by offset" and thereby avoid delivery. *Zelener*, 373

F.3d at 868.  As set forth above, Pacific Best customers had both written and verbal assurances

that they could avoid delivery by offset. [11]

**D. Defendants Have Not Suffered Prejudice**

Contrary to their constant refrain, defendants have not suffered any prejudice in their

ability to prepare an opposition to the plaintiffs' motion.  All defendants were properly served on

June 30, 2005.  Defendants were given liberal extensions to file an opposition and ultimately had

up to six weeks, after service, to conduct discovery, if necessary, and to file an opposition.

Despite the fact that the identity of plaintiffs' declarants—defendants' own customers—

has been known to defendants, defendants only began attempting to serve any of them less than

two weeks before their opposition was due. Defendants now ask this Court to strike plaintiffs'

declarations because some of the declarants are not available for defendants' 11th hour

---

[10]  Nostro accounts are more fully described in Hobson Decl., ¶26.

[11] In its faulty analysis of *Zelener,* defendants reference that the *Zelener* court relied on the
district court's opinion in *CFTC v. Frankwell Bullion,* in concluding that the contracts at issue in
*Zelener* and *Frankwell Bullion* were liquidated based on the market value determined at the time
of sale, not contracting.  The Commission has shown, and the defendants have not refuted, that
here the pricing is established at the time of contracting.  By citing to *Frankwell Bullion,*
defendants also imply that a fixed delivery date is required.  While futures contracts may often
have a fixed delivery date, it is not a critical element. *See e.g., CFTC v. Standard Forex,* 1996
WL 435440, *10).  As the Ninth Circuit recognized in *Co Petro*, "there is no established list of
elements of a futures contract." *CFTC v. Co Petro Mktng. Group, Inc.*, 680 F.2d 573, 581 (9th
Cir. 1982); See *Chicago Mercantile Exchange  v. SEC*, 883 F.2d 537, 549 (7th Cir. 1989)
(traditional elements of futures contracts are not invariable elements).  Lastly, the *Frankwell
Bullion* decision, both at the district court and circuit level, did not represent a final decision on
the merits of the case; it came before the court on a motion for preliminary injunction.  Thus, the
decision should not be given significant weight.

13

depositions.  With the exception of Christina Liang, all of the initial declarants, including Mr.

Lui, took time off of work to be present in court at the last hearing in this matter.[12]  Plaintiffs

made the declarants' presence known to the Court and to all defendants and counsel in the

courtroom.  Any of plaintiffs' declarants could have been cross examined or served with a

deposition subpoena by the defendants or attorney Lewis Phon at that time.  Defendants' claims

of prejudice ring hollow.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs have demonstrated a probable success on the merits

of their action and are entitled to a presumption of irreparable injury, having presented evidence

of fraud and the offering of illegal futures contracts,.  Accordingly, Plaintiffs respectfully move

this Court to grant their request for a preliminary injunction.

Respectfully submitted,

*Kevin Batteh*

_____
KEVIN K. BATTEH, (DC Bar No. 482021)
Trial Attorney
JAMES H. HOLL, III, (DC Bar No. 453473)
Senior Trial Attorney
ERIN E. VESPE, (CT Bar No. 407295)
Chief Trial Attorney
Attorneys for Plaintiff U.S. Commodity
Futures Trading Commission


_____/s/ EKS w/permission by KKB_____
WAYNE STRUMPFER
Acting California Corporations Commissioner
ALAN S. WEINGER (CA State Bar No. 86717)
Acting Deputy Commissioner
EDWARD KELLY SHINNICK (CA State Bar No. 96209)
Corporations Counsel
Attorneys for Plaintiff Commissioner of
Corporations of the State of California

_____

[12] Defendants have subpoenaed Ms. Liang and set her deposition for today.

14

Reply Memorandum of Points and Authorities