**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, et al.<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>NATIONAL INVESTMENT CONSULTANTS, INC., et al.<br><br>　　　　Defendants. | No. C 05-02641 JSW<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

**INTRODUCTION**

This matter comes before the Court upon consideration of the motion for a preliminary injunction filed by the Commodity Futures Trading Commission ("CFTC") and the Commissioner of Corporations of the State of California ("Commissioner") (collectively "Plaintiffs"). Plaintiffs contend that Defendants National Investment Consultants, Inc. ("NICI"), South China Investments, Inc. ("South China"), Pacific Best Group Ltd. a/k/a Pacific Best Company ("Pacific Best"), Yi Kerry Xu ("Xu"), Ring Ping Zhou a/k/a Flora Zhou ("Zhou"), Wei M. Tse a/k/a Raymond Tse ("Tse") and Theressa C. Wong ("Wong") (collectively "Defendants") have violated various provisions of the Commodity Exchange Act ("CEA") and the California Corporations Code.[1]

---

[1] On June 29, 2005, following an *ex parte* hearing, the Court granted Plaintiffs' *ex parte* application for a temporary restraining order ("TRO"). (Docket Nos. 12, 14.) That TRO has been in place since that time with Defendants' consent. (Docket Nos. 15, 24.)

Having considered the parties pleadings, relevant legal authority, and having had the benefit of oral argument, the Court hereby GRANTS Plaintiffs' motion as to Pacific Best, NICI, South China, and Zhou. The Court DENIES Plaintiffs' motion as to Xu and Tse.

**FINDINGS OF FACT**

The following factual findings are not meant to be binding, but rather represent those facts this Court finds probable that Plaintiffs can prove at trial. *See Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1423 (9th Cir. 1984).

A.    **The Defendants.**

South China is a now defunct California corporation, which was incorporated on or about November 9, 2000. (Declaration of Rung Ping Zhou, filed August 11, 2005 ("8/11/05 Zhou Decl."), ¶ 3.) Zhou was the sole shareholder and the President of South China until it ceased doing business on or about July 31, 2004. (*Id.*)

Xu was hired by South China in 2002, and she states that she worked for South China "until June of 2005." (Declaration of Yi Kerry Xu ("Xu Decl."), ¶ 2.) Xu corroborates Plaintiffs' assertions about South China's and NICI's hiring and training practices by stating she responded to an advertisement in a Chinese community newspaper and received only several weeks of training, and by admitting that she had no experience with foreign currency, futures or stocks at the time she was hired. NICI's and South China's hiring and training practices also involved encouraging account executives to find other investors once they were trained. (*See* Compl.; Xu Decl., ¶ 2; Declaration of Hongyu Christina Liang ("Liang Decl."), ¶¶ 2-4; Declaration of Tsz Ho (Danny) Lui ("Lui Decl."), ¶¶ 3-6; Plaintiff's Mot., Ex. 4.)[2] Xu denies making the alleged misrepresentations attributed to her.

According to Pacific Best and Zhou, South China entered into an agreement with Pacific Best, whereby South China was to act as an "introducing broker" for Pacific Best.[3] (*Id.*, ¶ 9;

---

[2]    The Liang and Lui Declarations are attached as Exhibits 2 and 3 to Plaintiffs' Motion.

[3]    Under the CEA, "'introducing broker' means any person ... engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery ... who does not accept any money, securities, or property (or extend credit in lieu thereof) to

Declaration of Lawrence Chi ("Chi Decl."), ¶ 9.) Although he denies working for South China, Tse had signatory authority over South China accounts and wired funds to an offshore account for the benefit of Pacific Best, and listed South China as his employer on banking documents, describing his position as a manager. In addition, Xu claims Tse hired her to work at South China and trained her, which again corroborates Plaintiffs' allegations. (*Compare* Declaration of Wei M. Tse, filed July 7, 2005 ("7/7/05 Tse Decl.") at 2:16-21, and Declaration of Wei M. Tse filed August 11, 2005 ("8/11/05 Tse Decl."), ¶ 3, *with* Liang Decl., ¶ 5; Lui Decl., ¶ 6; Plaintiffs' Reply Br., Ex. 5A[4]; Xu Decl., ¶ 3.)

On December 18, 2000, a permanent injunction was entered against Zhou in the case of *People v. Y&T, Inc. dba Tokyo Int'l Investment, Ltd.*, S.F. Super. Ct. No. 310-839. Pursuant to that injunction, Zhou was precluded from, *inter alia*, "[s]elling or purchasing or offering to sell or purchase any commodity under any commodity contract or under any commodity option or offering to enter into, or entering into, as seller or purchaser, or entering into, as seller or purchaser, any commodity contract or any commodity option, unless or until such activity is not in violation of Section 29520 of the California Commodity Law of 1990 ("CCL"). (Compl., Ex. A.) Zhou does not deny that she did not disclose this information to Defendants' customers. Instead, she claims she did not "fully understand" what it meant or that she was required to disclose it. (8/11/05 Zhou Decl., ¶ 7.)

NICI is a California corporation owned and operated by Jin Xiao ("Xiao").[5] (Xiao Decl., ¶ 2.) NICI was incorporated on or about February 2, 2004. (*Id.*) NICI also entered into an agreement with Pacific Best to act as an "introducing broker." (Xiao Decl., ¶ 4; Chi Decl., ¶ 9.) An excerpt from the "About Us" section of NICI's website states that NICI "was established

---

margin, guarantee, or secure any trades or contracts that may result therefrom." 7 U.S.C. § 1a(23).

[4] The Court has considered this exhibit because it contains documents that were obtained by Plaintiffs after the Court issued the Statutory Restraining Order and because it was offered to rebut Tse's declaration opposing the motion.

[5] Xiao is not named as a defendant in this case.

3

with a team that has more than 30 years of management and trading experience." (Plaintiffs' Mot., Ex. 1).

Again, although Tse and Xiao deny that Tse is an NICI employee or that he had access to clients' funds, there is evidence that he has signatory authority on at least one of NICI's bank accounts and listed his title as "General Manager." (*Compare* 7/7/05 Tse Decl., at 2:16-21, and 8/11/05 Tse Decl., ¶ 3, *with* Plaintiffs' Reply Br., Ex. 5A.) Zhou was employed by NICI until December 2004 as a marketing manager, and she claims to have worked for NICI since June 2004, while South China was still in existence. (Declaration of Run Ping Zhou filed July 7, 2005 ("7/7/05 Zhou Decl.") at 2:6-7.)

Although Zhou denies that she made many of the misrepresentations alleged by Plaintiffs, Zhou admits she conducted training sessions on trading in foreign currency and provided advice about using stop-loss orders both to customers and to NICI account executives. She also admits that she trained NICI account executives to emphasize the profit potential of foreign currency trading, but also contends she taught account executives to emphasize the speculative nature of the transactions. (*See generally* 8/11/05 Zhou Decl., ¶¶ 13-18, 20-21.)[6]

Pacific Best is a Virgin Islands Company that has been engaged in foreign currency trading in California for approximately six years. (Chi Decl., ¶ 3). Pacific Best claims that "when a customer trades in foreign currency," the trade is conducted through Poseng Bank or another unspecified "foreign exchange merchant" in Macau. (*Id.*, ¶ 5.) The service agreements that Pacific Best entered into with South China and NICI contemplated that these latter entities could accept client funds "in trust" for Pacific Best. (*Id.*, ¶ 9, Ex. A.) Tse attests to having been employed by Pacific Best since 1998 in the capacity of "business manager." (8/11/05 Tse Decl., ¶ 3).

When NICI or South China obtained customers for Pacific Best, the customers were required to "sign and execute Customer Agreements" ("the Customer Agreement") and were

---

[6] These latter admissions contradict statements in Zhou's declaration filed on July 7, 2005, in which she stated she had "never represented there was money to be made in investing in foreign currency," and had "never given any advice regarding foreign investments." (7/7/05 Zhou Decl., at 2:9-12.)

4

"governed by [Pacific Best's] Trading Rules and Regulations" ("the Rules"). (*Id.*, ¶9, Ex. A.) These Customer Agreements and Rules are described more fully in the following section.

None of the Defendants dispute the fact that they were not registered with the CFTC.

### B.   The Transactions.

The Customer Agreement provides that a customer may take long or short positions, and contains a provision which permits a customer to liquidate a given contract. (Customer Agreement, ¶¶ 2(b), 12.) It also contains a section entitled "<u>RISK DISCLOSURE STATEMENT</u>," which states, *inter alia*, "The risk of loss in trading spot currenies, [*sic*] contracts can be substantial. You should therefore consider whether such trading is suitable for you in light of your financial condition." (*Id.*) The Risk Disclosure Statement is enclosed inside a box and, except for the caption, the text of the Risk Disclosure Statement is in the same font as the remainder of the Customer Agreement. (*Id.*) Customers are permitted to place stop-loss orders in certain circumstances. (Customer Agreement, Risk Disclosure Statement; Rules, Section V.B.)

Pacific Best's Rules provide for standard contract sizes for five foreign currencies. (Rules, Section I.) For example, the standard contract size for Australian Dollars ("AUD") is 100,000 AUD and the standard contract size for the Euro ("EU") is 125,000 EU. (*Id.*) To trade with Pacific Best, the minimum initial deposit for a Trading Account is $20,000 U.S. dollars. (*Id.,* Section II.A.) The Rules also provide for a "Necessary Deposit," or margin, which is "the amount required by [Pacific Best] as a guarantee deposit for every contract or lot traded in the Customer's Trading Account, whether these positions be buying (long) or selling (short)." (*Id.*, Section II.B.; *see also* Chi Decl., ¶ 9, Ex. A (referencing depositing "margins").) The necessary deposit for a day trade is $1,000 US per lot and is $2,000 US per lot for an overnight trade. (*Id.*) Pacific Best earns a commission of $100.00 US for "every contract closed or settled." (*Id.*, Section II.C.)

The Rules also contain a section regarding Premiums and Discounts and state that "[t]he Premium/Discount as determined by the interest rates shall be added/deducted to/from the [account] based on the number of contract lots, and their respective market values computed at

5

the open executed rates and fluctuations in the interest rates.  For the Trading Account with outstanding position(s), the total Premium/Discount of previous month shall be added/deducted to/from the Account's Ledger Balance in form of Adjustment in the succeeding month's 1st trading day's Statement." (Rules, Section IV.B.)

There are two references to "delivery" in the Customer Agreement , but no references to delivery in the Rules.  Paragraph 2(f) provides that "the customer will observe and accept all rules, necessary deposit requirements, trading facts, time table(s) for placing orders, taking/making delivery and/or other matters for and related to his investment/trading as prescribed by [Pacific Best] from time to time." (Customer Agreement, ¶ 2(f)).  The Customer Agreement also provides that, "[a]gainst a position in any investment or trading, the Customer will give [Pacific Best] instructions to cover or furnish [Pacific Best] with all necessary delivery documents, and in default thereof [Pacific Best] may without demand or notice cover the liability within necessary time [*sic*] in the manner deemed most appropriate by [Pacific Best] ... ." (Customer Agreement, ¶ 4(a).)

At least some of Defendants' customers state that they never intended to take delivery of the currency and entered into these transactions solely for the purpose of speculating in the foreign currency market.  (*See* Liang Decl., ¶ 9; Lui Decl., ¶ 9; Declaration of Steven Ting ("Ting Decl."), ¶ 15; Declaration of Sylvia Obradovic ("Obradovic Decl."), ¶ 14.[7]  A review of customer invoices shows that the contract price is fixed at the time the customer enters the transaction, that a commission is charged only when the customer has entered into an offsetting transaction, and that contracts remained open over extended periods of time.  (*See e.g.,* Plaintiffs' Mot., Exs. 2C, 3C, 6C, 7C.)

Ronald B. Hobson, an Industry Economist in the CFTC's Office of Chief Economist, opines that the transactions in question in this case are futures contracts.  (Hobson Decl., ¶¶ 27-34.)  Defendants' expert, Gordon Rausser, disagrees with this opinion, but concedes that the transactions exhibit some characteristics of futures contracts.  (Rausser Decl., ¶ 4.)

---

[7]     These declarations are attached as Exhibits 2, 3, 5, and 7, respectively, to Plaintiffs' Motion.

6

**CONCLUSIONS OF LAW**

**A.   Legal Standards Applicable to Motions for Preliminary Injuctions.**

The standards for obtaining a preliminary injunction are well established. It is appropriate to issue a preliminary injunction if the moving party establishes either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in favor of the moving party. *Stuhlbarg Intern. Sales Co. v. John D. Brush and Co.*, 240 F.3d 832, 839-840 (9th Cir. 2001). "These formulations are not different tests, but represent two points on a sliding scale in which the degree of irreparable harm increases as likelihood of success on the merits decreases." *Big Country Foods, Inc. v. Board of Education*, 868 F.2d 1085, 1088 (9th Cir. 1989)).

Although Plaintiffs must, in the first instance, establish a likelihood of success on the merits of their claims to establish their right to a preliminary injunction, unlike private actions for equitable relief, an action brought by the CFTC for injunctive relief is a creature of statute. Therefore, the Court's function in determining whether to enforce and implement Congressional policy is a different function "from that of the Court when weighing claims of two private litigants." *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 174-76 (9th Cir. 1987). "Where an injunction is authorized by statute, and the statutory conditions are satisfied, ... the agency to whom the enforcement of the right has been entrusted is not required to show irreparable injury." *Id.*; *see also United States v. Nutri-Cology, Inc.*, 982 F.2d 394, 398 (9th Cir. 1992). If, however, Plaintiffs merely establish a "colorable evidentiary showing" that they will prevail on the merits, they will not receive the benefit of this presumption. *Nutri-Cology*, 982 F.2d at 398.

**C.   Plaintiffs Have Established a Likelihood of Success that Pacific Best, South China, and NICI Violated 7 U.S.C. § 6(a).**

With respect to the alleged violations of Section 6(a), Defendants contend that Plaintiffs cannot establish a likelihood of success on the merits of their claims because the contracts at issue are not futures contracts but, rather, are spot contracts, which lie outside the CFTC's enforcement jurisdiction. *See, e.g., CFTC v. Noble Wealth Data Information Services, Inc.*, 90

F. Supp. 2d 676, 689 (D. Md. 2000) ("*Noble Wealth*"), *aff'd in pertinent part and rev'd in part on other grounds sub nom.*, *CFTC v. Baragosh*, 278 F.3d 319 (4th Cir. 2002).

The CFTC has "jurisdiction over, an agreement, contract, or transaction in foreign currency that (i) is a contract of sale of a commodity for future delivery ... and (ii) is offered to, or entered into with, a person that is not an eligible contract participant, unless" such contract is entered into with an appropriate counterparty. 7 U.S.C. § 2(c)(2)(B).[8] Subject to certain exceptions, not applicable here, it is unlawful under the CEA "for any person to offer to enter into, to enter into, to execute, to confirm the execution of, or to conduct any office or business anywhere in the United States ... for the purpose of soliciting or accepting any order for, or otherwise dealing in, any transaction in, or in connection with, a contract for the purchase or sale of a commodity for future delivery ... ." 7 U.S.C. § 6(a). "A futures contract that violates this provision is deemed an illegal 'off-exchange' futures contract." *In re Bybee*, 945 F.2d 309, 312 (9th Cir. 1991).

The term "futures contract" is not defined by the CEA, but courts have described futures contracts as involving " standardized contracts for the purchase or sale of commodities which provide for future, as opposed to immediate, delivery." *In re Bybee*, 945 F.2d at 312; *accord Noble Wealth,* 90 F. Supp. 2d at 688 ("a 'futures contracts' has been defined as a contract for the purchase or sale of a commodity for delivery in the future at a price established at the time the contract is initiated"). The Ninth Circuit has stated that there is "no bright-line definition or list of characterizing elements [of a futures contract that] is determinative. The transaction must be viewed as whole with a critical eye toward its underlying purpose." *CFTC v. Co Petro Mktg. Group, Inc.*, 680 F.2d 573, 577 (9th Cir. 1982).

Some "basic characteristics" of futures contracts are: standardized terms with respect to quantity and other terms, excluding price; a fungible nature of the contract that "facilitates offsetting transactions by which purchasers or sellers can liquidate their positions;" and a price differential between opposite contracts that determines an investor's profit or loss. *See Co*

---

[8] None of the Defendants dispute that they placed orders on behalf of persons who do not qualify as "eligible contract participants;" nor do they dispute the fact that the transactions in question were not entered into with proper counterparties under the CEA.

*Petro*, 680 F.2d at 579-80. Courts in other jurisdictions have recognized these same characteristics and have also noted that a purpose to speculate coupled with the lack of intention to take delivery of a commodity, initial margin deposits, and the maintenance of margins or similar payments, also are indicative of a futures contract. *See CFTC v. Int'l Foreign Currency, Inc.*, 334 F. Supp. 2d 305, 310 (S.D.N.Y. 2004); *CFTC v. Int'l Financial Services (New York), Inc.*, 323 F. Supp. 2d 482, 494 (S.D.N.Y. 2004).

In contrast to futures contracts, spot contracts have been described as "agreements for the purchase and sale of commodities that anticipate near-term delivery." *Noble Wealth*, 90 F. Supp. 2d at 689 (citing *Dunn v. CFTC*, 519 U.S. 465, 472 (1997)).[9] Thus, "[t]he 'spot market' is essentially the current market," and "spot transactions in foreign currencies call for settlement within two days." *CFTC v. Frankwell Bullion Ltd.*, 99 F.3d 299, 301 n.2 (9th Cir. 1996) (quoting *Bank Brussels Lambert, S.A. v. Intermetals Corp.*, 779 F. Supp. 741, 742 (S.D.N.Y. 1991)); *see also CFTC v. Zelener*, 2003 U.S. Dist. LEXIS 17660 (N.D. Ill. Oct. 3, 2003) (*Zelener I*), *aff'd* 373 F.3d 861 (7th Cir. 2004) (*Zelener II*).

Here, the Customer Agreements and Rules enabled Defendants' customers to purchase and/or sell foreign currencies in the future in lots of standardized size and at a predetermined price. (Rules, Sections I, III.B.) Although there is no evidence that the purchase or sale was to take place on a predetermined date, Defendants' customers stated that they did not intend to take delivery of the currency and engaged in these transactions solely for purposes of speculation. (*See* Liang Decl., ¶ 9; Lui Decl., ¶ 9; Ting Decl., ¶ 15; Obradovic Decl., ¶ 14). Further, Defendants' customers opened their Trading Accounts by making an initial deposit (margin), and the customers were required to make further necessary deposits to these accounts when their balances reached a certain level as a result of losing positions, or they ran the risk that the accounts would be liquidated or hedged without prior notice. (*See, e.g,* Plaintiffs' Mot., Ex. 2C (invoices, which include a notice titled "Required Supplement Deposit as at Market Closing on

---

[9] "Spot contracts are excluded from regulation under the [CEA] because Congress felt that transactions in the commodity itself which anticipate actual delivery did not present the same opportunities for speculation, manipulation, and outright wagering that trading in futures and options presented." *Noble Wealth*, 90 F. Supp. 2d at 689 (internal quotation marks omitted).

9

10/20/2004"). While disputing the point, Defendants' expert concedes the Customer Agreement and Rules have some of the characteristics of futures contracts. (Rausser Decl., ¶ 3.) Further, the contracts in this case, unlike the contracts in *Zelener I*, do not contain an explicit provision calling for settlement within 48 hours, a point that the district court found particularly persuasive in concluding the contracts were spot contracts. *See Zelener I*, 2003 U.S. Dist. LEXIS 17660 at *11. The Rules, however, do contain a statement that any transaction made pursuant to a verbal instruction of the customer is binding and that the "[c]ustomer shall confirm in writing 48 (forty-eight) hours or such longer time as you may allow any such verbal instructions." (Rules, Section III.D.2.)

Defendants argue that the transactions in this case are much like the transactions at issue in *Zelener* and *Frankwell Bullion*. Defendants highlight the fact that there is no definite delivery date set and note that the transactions appear to be rolled over on a daily basis. They also argue that there is nothing to suggest that Pacific Best promised the customer the right of offset. *See Zelener II*, 373 F.3d at 868 (noting that "promise to create offset makes a given set up work *as if* fungible"). Finally, Defendants argue that the reference in the rules to the 48 hour period for confirmation of instructions demonstrates that this time period is an important factor in the relationship between Defendants and their customers, suggesting that the transactions at issue are in spot contracts.

The Court recognizes that in *CFTC v. Frankwell Bullion Ltd.*, 1994 WL 449071 (N.D. Cal. Aug. 12, 1994), *aff'd* 99 F.3d 299 (9th Cir. 1996), the district court examined transactions which had similar characteristics to the transactions at issue in this case, including the lack of a fixed delivery date. The *Frankwell Bullion* court opined, but did not decide, that the facts presented undermined the likelihood that the plaintiffs would be able to show that the contracts were futures contracts. *Id.* at *2. Defendants highlight the *Frankwell Bullion* court's statement that "the daily roll-over has the effect of sufficiently undercutting plaintiffs' argument as to undermine seriously the possibility that plaintiffs will ultimately prevail on the merits of their complaint." *Id.* Defendants argue that the transactions in this case likewise are rolled over on a daily basis and point the Court to the fact that the Rules provide for a Premium or Discount,

which they equate to the price a customer is charged to roll the transaction over each day. This argument makes sense however only if such a fee is deducted from the account. The Rules, however, contemplate that a premium may be added to the customer's account balance. However, in finding the daily roll-over fact persuasive, the court in *Frankwell Bullion* noted that the daily closing "is the method in which defendants make their commissions." *Id.* Here, by contrast, defendants do not earn a commission until the transaction is fully settled.

On the whole, the court finds the transactions in *Frankwell Bullion* and *Zelener* to be sufficiently distinguishable from those at issue in this case. The Customer Agreement, the Rules and the invoices in the record, share many of the general characteristics of futures contracts described above. Further, the evidence shows that customers intended to speculate and did not intend to take delivery of the currency. Finally, the lack of persuasive evidence that the transactions at issue are settled or call for delivery within a 48 hour period, a key provision of spot contracts, also leads the Court to conclude the Plaintiffs have met their burden at this preliminary stage to show that the transactions in questions are futures contracts. *See, e.g., Int'l Foreign Currency*, 334 F. Supp. 2d at 305; *Int'l Financial Services*, 323 F. Supp. 2d 482; *CFTC v. Calvary Currencies LLC*, 2004 WL 2330725 (D. Md. Oct. 15, 2004); *CFTC v. Standard Forex*, 1996 WL 435440 (E.D.N.Y. July 25, 1996).

Thus, viewing the transactions as a whole and "with a critical eye toward [their] underlying purpose," the Court concludes that it is more likely than not that Plaintiffs will be able to show that the contracts are futures contracts. *See Standard Forex*, 1996 WL 435440 at *8 (noting prior holding that for purposes of a preliminary injunction court concluded contracts at issue were more likely than not futures contracts). Therefore, Plaintiffs have met their burden to show a likelihood of success on the merits that Pacific Best, South China and NICI violated 7 U.S.C. § 6(a) and are entitled to a presumption of irreparable harm.[10]

---

[10] Based on this finding, the Court also concludes that Plaintiffs are likely to succeed on the merits of their on their state law claim that these Defendants violated Section 29520 of the California Corporations Code.

11

    **C.**    **Plaintiffs' Have Established a Likelihood of Success that Zhou, NICI, South China, and Pacific Best Violated 7 U.S.C. § 6b But Have Not Established a Likelihood of Success that Xu and Tse Violated 7 U.S.C. § 6b.**

The CEA also contains anti-fraud provisions. *See* 7 U.S.C. § 6b(a)(2). A violation of those provisions occurs "when (1) an entity or person makes misrepresentations or deceptive omissions (2) with scienter and (3) the misrepresentations are material." *Noble Wealth*, 90 F. Supp. 2d at 685; *see also CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 774 (9th Cir. 1995) ("*Noble Metals*") (holding that *scienter* is element of a violation of Section 6b). Plaintiffs can establish *scienter* by showing that a defendant knew the representations were false and were calculated to cause harm or by showing that the representations were made with a reckless disregard for their truth or falsity. *Noble Wealth*, 90 F. Supp. 2d at 686 (citing *Noble Metals*, 67 F.3d at 774). Plaintiffs can demonstrate materiality by showing that the statement or omission is one that a reasonable investor would consider important in making an investment decision. *Id.*

    Setting aside disputed evidence regarding representations as to the profit potential of the transactions in question, it is undisputed that Zhou did not disclose the fact that she had been permanently enjoined from engaging in foreign currency transactions to customers. This is the type of omission that the Court concludes a reasonable investor would consider important in making an investment decision and thus was material. *Cf., Noble Wealth*, 90 F. Supp. 2d at 687 ("false representations regarding a broker's expertise are material"). Even if the failure to disclose this information was not intentional, it was at the very least reckless and an "extreme departure from the standards of ordinary care," and therefore satisfies the scienter element. *Id.*; *Noble Metals*, 67 F.3d at 774. Because Zhou's acts are attributable to the corporate defendants pursuant to 7 U.S.C. § 2(a)(1)(B), the Court concludes that Plaintiffs have met their burden to establish a likelihood of success on the merits of their claims that these four Defendants violated Section 6b of the CEA and are entitled to a presumption of irreparable harm.[11]

---

    [11]    Again, based on this finding, the Court concludes Defendants are likely to prevail on the merits of their claim that these four Defendants violated Section 29536 of the California Corporations Code.

Although the record may become more developed in the future, based on the evidence currently before the Court, most notably the disputed evidence with respect to Xu and Tse's alleged representations regarding profit potential and the risk associated with the transactions, the Court cannot find Plaintiffs have met their burden to show they are likely to succeed on the merits of their fraud claims against Xu and Tse. Accordingly, Plaintiffs' motion is DENIED as to Xu and Tse.

## CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART AND DENIES IN PART Plaintiffs' motion for a preliminary injunction. The Statutory Restraining Order that has been in place as to Defendants Tse and Xu is HEREBY DISSOLVED AS OF THE DATE OF THIS ORDER.

The parties are FURTHER ORDERED to appear for a further case management conference immediately following the motion hearing noticed for October 14, 2005 at 9:00 a.m. The parties joint case management statement shall be due on or before October 7, 2005.

**IT IS SO ORDERED.**

Dated: August 26, 2005

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE